STATE OF CONNECTICUT, et al., and State of California, Plaintiffs-Intervenors, Appellants,

v.

Richard S. SCHWEIKER, Secretary of Health and Human Services, et al.

No. 81–2090.

United States Court of Appeals, District of Columbia Circuit.

Argued April 27, 1982.

Decided July 27, 1982.

Charles A. Miller, Washington, D. C., with whom Arvid E. Roach, II, and Karen H. Rothenberg, Washington, D. C., were on the brief, for plaintiffs-intervenors, appellants, State of Conn., et al.

Elisabeth C. Brandt, Deputy Atty. Gen., State of Cal., Sacramento, Cal., with whom Carol Hunter, Deputy Atty. Gen., Sacramento, Cal., was on the brief, for plaintiff-intervenor, appellant, State of Cal.

Neil H. Koslowe, Sp. Litigation Counsel, Dept. of Justice, Washington, D. C., with whom Charles F. C. Ruff, U. S. Atty. at the time the brief was filed, Washington, D. C., Juan A. Del Real, Gen. Counsel, and Lynne K. Zusman, Deputy Gen. Counsel, Dept. of Health and Human Services, Washington, D. C., were on the brief, for appellees.

Before EDWARDS and BORK, Circuit Judges, and DUDLEY B. BONSAL, United

States Senior District Judge for the Southern District of New York.*

Opinion for the Court filed by Circuit Judge HARRY T. EDWARDS.

HARRY T. EDWARDS, Circuit Judge:

In this case we are called upon to determine whether Congress appropriated funds in fiscal year 1981 to reimburse the ten appellant States for expenditures they incurred prior to September 30, 1978 in operating various programs under the Social Security Act. The States submitted these "prior-period" claims for reimbursement, totalling approximately 382 million dollars, to appellee Department of Health and Human Services ("HHS"). HHS refused to process the claims, however, on the ground that they were not timely filed under the 1981 appropriations laws and thus could not be paid out of fiscal year 1981 funds. Appellants filed this suit for declaratory and injunctive relief, seeking to compel HHS to process the disputed claims and to have an appropriate portion of otherwise unobligated funds for fiscal year 1981 reserved for the payment of the pending claims.

█ Briefly stated, the central issue in this litigation involves an apparent conflict between two congressional enactments—a 1980 amendment to the Social Security Act and the continuing appropriations resolutions for HHS for fiscal year 1981. HHS contended before the District Court, as it does on appeal, that the 1981 continuing appropriations resolutions incorporated a restriction from an earlier appropriations bill. That restriction prohibited payment of claims for expenditures incurred prior to September 30, 1978 if the claims were not filed within one year after the expenditures were made. Because the appellant States did not meet this one-year time limit in

filing the prior-period claims at issue here, HHS maintained that the claims could not be paid out of fiscal year 1981 funds. The District Court accepted this argument and dismissed appellants' suit.

Appellants contend that a 1980 amendment to the Social Security Act—section 306 of Public Law No. 96–272—established permanent time limits for filing claims for reimbursement, including the type of prior-period claims at issue in this case. Based principally on the language and legislative history of section 306, they argue that the time limits in that provision control in this case. Having complied with the provisions of section 306, appellants insist that HHS could not lawfully refuse to pay their prior-period claims out of fiscal year 1981 funds and that the District Court erred in dismissing their suit.

For the reasons set forth below, we agree that section 306 is controlling in this case and, consequently, that the 1981 appropriations laws do not prohibit the use of fiscal year 1981 funds to pay the prior-period claims filed by appellants in accordance with section 306. As explained below, we also reject the Government's contention that, under the circumstances of this case, appellants are no longer entitled to injunctive relief. We therefore reverse the District Court's decision and remand for the District Court to fashion appropriate relief.

## I. BACKGROUND

The states for many years have operated, in cooperation with the federal government, certain public assistance programs under the Social Security Act, 42 U.S.C. §§ 301–1397f (1976 & Supp. IV 1980).[1] Under the Act, the states are entitled to reimbursement for a specified percentage of their actual expenditures in operating the programs. To be eligible for reimbursement,

---

* Sitting by designation pursuant to 28 U.S.C. 294(d) (Supp. IV 1980).

1. The programs under the Social Security Act that are relevant to this case include Title IV, Part A, 42 U.S.C. §§ 601–613 (1976 & Supp. IV 1980) (Aid to Families with Dependent Children); Title IV, Part B, 42 U.S.C. §§ 620–628 (1976 & Supp. IV 1980) (Child-Welfare Serv-

ices); Title XVI, 42 U.S.C. §§ 1381–1383c (1976 & Supp. IV 1980) (Supplemental Security Income for the Aged, Blind, and Disabled); Title XIX, 42 U.S.C. §§ 1396–1396m (1976 & Supp. IV 1980) (Medical Assistance Programs ("Medicaid")); and Title XX, 42 U.S.C. §§ 1397–1397f (1976 & Supp. IV 1980) (Social Services).

the states must have a plan, approved by HHS, for each social security program in operation. HHS provides the federal funds, called "federal financial participation" ("FFP"), for reimbursement of the participating states. HHS generally makes grants to the states prior to each calendar quarter based on estimates of the states' anticipated expenditures. The states submit reports after each quarter showing their actual program expenditures. HHS eliminates any discrepancies between estimated and actual expenditures by adjusting the states' grants for the next calendar quarter. *See, e.g.*, 42 U.S.C. §§ 1396a–1396b (1976).

For a number of reasons, the states have regularly included in their quarterly reports previously unreported expenditures incurred in earlier quarters. Known as prior-period adjustments, these are, in effect, claims for reimbursement for earlier expenditures. Until 1980, the Social Security Act contained no time limits on submitting claims for prior-period expenditures. The absence of any time limits apparently made it more difficult for HHS to plan and administer the budget for the various Social Security Act programs. This case stems from Congress' efforts to deal with this problem.

A. *Relevant Legislation*

*H.R. 4389.* Both the House and the Senate passed provisions in the fiscal year 1980 appropriations bill for the Departments of Labor and Health, Education, and Welfare ("HEW") which stated: "No payment shall be made from this appropriation to reimburse State or local expenditures made pri-

2. Earlier, in an appropriations bill for the Departments of Labor and Health, Education, and Welfare and Related Agencies for fiscal year 1979, H.R. 12929, 95th Cong., 2d Sess. (1978), the Senate Appropriations Committee included a provision requiring states to submit claims for Medicaid expenditures made prior to September 30, 1977 within 90 days after enactment of the bill. *See* S.Rep.No. 1119, 95th Cong., 2d Sess. 83 (1978). The provision was deleted in conference. *See* H.R.Rep.No. 1746, 95th Cong., 2d Sess. 16–17 (1978) (Conference Report); Part II.C. *infra*.

or to September 30, 1978." H.R. 4389, 96th Cong., 1st Sess. (1979); H.R.Rep.No.400, 96th Cong., 1st Sess. 18 (1979) (Conference Report).[2] Despite the language suggesting otherwise, the Conference Report on H.R. 4389 made clear that this provision was not intended to be an absolute bar to reimbursement of pre-September 30, 1978 expenditures; rather, the conferees stated, "This language provides for a one year limitation on the time period available to the States during which they can claim Federal matching funds for State or local expenditures" incurred prior to September 30, 1978. *Id.*

*1980 Continuing Appropriations Resolutions.* The conference version of H.R. 4389 never passed the Senate, however, because of an irreconcilable conflict with the House over a provision concerning federal funding of abortions. As a result, Congress never enacted a full appropriations statute for HEW for 1980. Instead, it adopted continuing appropriations resolutions that appropriated funds for HEW in accordance with the provisions of H.R. 4389 as it had passed the House. The resolutions appropriated

[s]uch amounts as may be necessary for projects or activities provided for in the Departments of Labor, and Health, Education, and Welfare and Related Agencies Appropriations Act, 1980 (H.R. 4389), at a rate of operations, and to the extent and in the manner, provided for in such Act as adopted by the House of Representatives on August 2, 1979 . . . .

Act of Oct. 12, 1979, Pub.L.No. 96–86, § 101(j), 93 Stat. 656, 659 (1979); Act of Nov. 20, 1979, Pub.L.No. 96–123, § 101(g), 93 Stat. 923, 925 (1979).[3]

3. Congress appropriated additional funds for fiscal year 1980 in the Supplemental Appropriations and Rescission Act, 1980, which was enacted on July 8, 1980. The Act provided additional funds to HHS for "Grants to States for Medicaid," but contained the following limitation:

Notwithstanding any other provision of law, no payment shall be made from this appropriation to reimburse State or local expenditures made prior to October 1, 1977 unless a request for reimbursement had been officially

*Section 306.* While the conference version of H.R. 4389 was still pending, Congress was also considering amending the Social Security Act itself to incorporate permanent time limits on state filings of reimbursement claims. Congress ultimately enacted these time limits as part of the Adoption Assistance and Child Welfare Act of 1980, Pub.L.No. 96–272, § 306, 94 Stat. 500, 530–31 (1980) (codified at 42 U.S.C. § 1320b–2 & note (Supp. IV 1980)) ("section 306"), which the President signed on June 17, 1980. Section 306(a) established a general two-year time limit on the filing of state claims for reimbursement.[4] Sections 306(b) and (c), which were added on the floor of the Senate, delineated the retroactive reach of section 306 by establishing the applicable limitations on payment for past expenditures. Section 306(b)(1) made the

general, two-year time limit applicable only to claims for expenditures incurred on or after October 1, 1979.[5] Section 306(b)(2) provided that there would be no deadline for reimbursement of pre-October 1, 1979 expenditures for which a claim was filed before the date of enactment of section 306.[6] For pre-October 1, 1979 expenditures for which no claim had been filed by the date of enactment, section 306(b)(3) required that claims be filed before January 1, 1981.[7] (The Secretary of HHS later extended this deadline to May 15, 1981. *See* note 12 *infra*.) Finally, section 306(c) stated:

> Notwithstanding any other provision of law, there shall be no time limit for the filing or payment of such claims except as provided in this section, unless such other provision of law, in imposing such a

transmitted to the Federal government by the State within two years after the fiscal year in which the expenditure occurred.
Pub.L.No.96–304, tit. I, ch. IX, 94 Stat. 857, 885 (1980).

4. Section 306(a) provided in full:
SEC. 306. (a) Part A of title XI of the Social Security Act is amended by adding after section 1131 the following new section:
"PERIOD WITHIN WHICH CERTAIN CLAIMS MUST BE FILED
"SEC. 1132. (a) Notwithstanding any other provision of this Act (but subject to subsection (b)), any claim by a State for payment with respect to an expenditure made during any calendar quarter by the State—
"(1) in carrying out a State plan approved under title I, IV, V, X, XIV, XVI, XIX, or XX of this Act, or
"(2) under any other provision of this Act which provides (on an entitlement basis) for Federal financial participation in expenditures made under State plans or programs, shall be filed (in such form and manner as the Secretary shall by regulations prescribe) within the two-year period which begins on the first day of the calendar quarter immediately following such calendar quarter; and payment shall not be made under this Act on account of any such expenditure if claim therefor is not made within such two-year period; except that this subsection shall not be applied so as to deny payment with respect to any expenditure involving court-ordered retroactive payments or audit exceptions, or adjustments to prior year costs.
"(b) The Secretary shall waive the requirement imposed under subsection (a) with respect to the filing of any claim if he determines (in accordance with regulations) that

there was good cause for the failure by the State to file such claim within the period prescribed under subsection (a). Any such waiver shall be only for such additional period of time as may be necessary to provide the State with a reasonable opportunity to file such claim. A failure to file a claim within such time period which is attributable to neglect or administrative inadequacies shall be deemed not to be for good cause."
Pub.L.No.96–272, § 306(a), 94 Stat. 500, 530 (1980).

5. Section 306(b)(1) provided:
The amendment made by subsection (a) shall be effective only in the case of claims filed on account of expenditures made in calendar quarters commencing on or after October 1, 1979.

6. Section 306(b)(2) provided:
In the case of claims filed prior to the date of enactment of this Act on account of expenditures described in section 1132 of the Social Security Act made in calendar quarters commencing prior to October 1, 1979, there shall be no time limit for the payment of such claims.

7. Section 306(b)(3) provided:
In the case of such expenditures made in calendar quarters commencing prior to October 1, 1979, for which no claim has been filed on or before the date of enactment of this Act, payment shall not be made under this Act on account of any such expenditure unless claim therefor is filed (in such form and manner as the Secretary shall by regulation prescribe) prior to January 1, 1981.

time limitation, specifically exempts such filing or payment from the provisions of this section.

The dispute in this case turns largely on the interpretation of the terms of section 306(c).

*1981 Continuing Appropriations Resolutions.* Congress was again unable to pass an appropriations statute for HHS for fiscal year 1981.[8] Consequently, it again enacted continuing resolutions that appropriated funds for HHS programs for fiscal year 1981. The first Joint Resolution, enacted on October 1, 1980, stated:

> Whenever an Act listed in this subsection has been passed by only the House as of October 1, 1980, the pertinent project or activity shall be continued under the appropriation, fund, or authority granted by the House, but at a rate for operations not exceeding the current rate or the rate permitted by the action of the House, whichever is lower, *and under the authority and conditions provided in applicable appropriation Acts for the fiscal year 1980*, except section 201 of title II of the Departments of Labor, and Health, Education, and Welfare and Related Agencies Appropriations Act, 1980 (H.R. 4389) as adopted by the House of Representatives on August 2, 1979 . . . .

Pub.L.No. 96–369, § 101(a)(4), 94 Stat. 1351, 1351–52 (1980) (emphasis added).[9] The

second continuing appropriations resolution, enacted on December 16, 1980, contained a virtually identical provision for the funding of HHS projects. Pub.L.No. 96–536, § 101(a)(4), 94 Stat. 3166 (1980).[10]

The parties before us apparently disagree about whether the words "applicable appropriations Acts for the fiscal year 1980" refer directly to H.R. 4389, or to the 1980 continuing appropriations resolutions, which in turn incorporated the provisions of H.R. 4389. *See* Part II.A. *infra.* Under either interpretation, however, the 1981 continuing resolutions referred to and continued funding under the terms of H.R. 4389. HHS contends that the 1981 continuing resolutions thereby incorporated the one-year time limit on prior-period claims contained in H.R. 4389.[11] Appellants argue that, because the 1981 continuing resolutions neither referred to the time limits in H.R. 4389 nor complied with the explicit exemption requirement of section 306(c), the time limits specified in section 306 must control in this case.

## B. *Relevant HHS Rulemakings*

On January 15, 1981, HHS promulgated final regulations implementing section 306. As authorized by section 306(b)(4), HHS waived the January 1, 1981 deadline for filing claims based on expenditures incurred

---

**8.** The bill that was to be the 1981 appropriations act for HHS was never enacted by Congress. Departments of Labor, Health and Human Services, and Education, and Related Agencies Appropriation Bill, 1981, H.R. 7998, 96th Cong., 2d Sess. (1980). In that bill, the House Appropriations Committee inserted language "prohibiting the Department [of HHS] from reimbursing States for State and local expenditures which were not submitted to the Federal Government within 2 years after the fiscal year in which the expenditure occurred." H.R.Rep.No. 1244, 96th Cong., 2d Sess. 71 (1980); *see* 126 Cong.Rec. H7948–49 (daily ed. Aug. 27, 1980).

**9.** Section 201 of H.R. 4389, known as the "Michel Amendment," which was excepted from the continuing appropriations resolution, reduced HEW's appropriations by $500 million. The reduction was to be achieved through the reduction of fraud, abuse and waste by the agency. *See* H.R.Rep.No. 400, 96th Cong., 1st

Sess. 25 (1979) (Conference Report on H.R. 4389).

**10.** The provisions of Pub.L.No.96–536 were extended to the end of fiscal year 1981 by the Supplemental Appropriations and Rescission Act, 1981, Pub.L.No.97–12, § 401, 95 Stat. 14, 95 (1981).

**11.** Conceivably, the language of this provision could also refer to the Supplemental Appropriations and Rescission Act, 1980, which contained a time limit on prior-period claims different from the one in H.R. 4389. *See* note 3 *supra.* The time limit in the 1980 Supplemental Act, however, is not a general limit for 1980, but a limit on payment of certain prior-period claims for a particular supplemental grant of Medicaid funds. None of the parties has suggested that the 1981 appropriations resolutions referred to or incorporated this time limit or any other provision of the 1980 Supplemental Act.

prior to October 1, 1979, and extended the deadline for filing such claims to May 15, 1981. 46 Fed.Reg. 3527, 3528 (1981).[12] All of the prior-period claims at issue in this case were filed by May 15, 1981.

On April 24, 1981, however, HHS published a proposed regulation that prevented the use of fiscal year 1981 appropriations to pay state claims for reimbursement of pre-September 30, 1978 expenditures unless the claims were filed within one year of the expenditures. 46 Fed.Reg. 23,273 (1981). This prohibition was based on HHS's belief that the 1981 appropriations resolutions incorporated the one-year time limit in H.R. 4389. Although HHS did not discuss section 306(c), it did note the "apparent inconsistency" between the filing deadlines in section 306 and those incorporated by reference into the fiscal year 1981 appropriations resolutions. HHS concluded that the appropriations resolutions were controlling because they were enacted later and because "section 306, as an authorizing statute, cannot have the effect of overriding the subsequently enacted appropriation restriction." 46 Fed.Reg. at 23,274.

HHS adopted the proposed rule in final form on September 17, 1981. 46 Fed.Reg. 46,134 (1981) (codified at 45 C.F.R. § 95.11 (1981)). In the preamble to the final rule, HHS provided a somewhat different explanation of why, "[e]ven in light of [section 306(c)]," the time limit incorporated in the 1981 appropriations laws controlled. HHS stated that Congress had enacted section 306(c) solely in response to H.R. 4389, which was still pending at that time, and that

section 306(c) was therefore "inapplicable to laws subsequently enacted by Congress." 46 Fed.Reg. at 46,135. Thus, HHS concluded that section 306(c) did not apply to the subsequently enacted appropriations resolutions for fiscal year 1981.

### C. Proceedings Below

Based on the position it adopted in its proposed rule, HHS refused to process appellants' claims for reimbursement of pre-September 30, 1978 expenditures unless they were filed within one year of the expenditures. On September 15, 1981, two days before publication of the final HHS rule, appellants filed this suit for declaratory and injunctive relief in the District Court.[13]

The States sought a declaration that section 306 established the controlling time limits for the filing and payment of claims for federal matching funds for pre-September 30, 1978 expenditures and that the continuing appropriations resolutions for fiscal year 1981 did not bar the payment of such claims. They also sought an injunction directing HHS to treat as timely filed their claims based on pre-September 30, 1978 expenditures, which were filed by May 15, 1981, the applicable deadline under section 306, and to process and pay those claims to the extent they were otherwise allowable. See J.A. 11–12.[14] In addition, the States sought a temporary restraining order and preliminary injunction reserving and setting aside a portion of the remaining HHS appropriations for fiscal year 1981 to re-

---

12. Section 306(b)(4) allowed the Secretary of HHS to waive for good cause the filing requirements of § 306(b)(3) (which concerned pre-October 1, 1979 expenditures for which no claim had been filed before enactment of § 306). Pub.L.No.96–272, § 306(b)(4), 94 Stat. 500, 531 (1980). In waiving the requirements, the Secretary explained: "[W]e are waiving the January 1, 1981 filing date and extending it to May 15, 1981, without States having to request a waiver. We find good cause for this waiver because States will need additional time to comply with these regulations." 46 Fed.Reg. at 3528.

13. Suit was initially filed by the States of Connecticut, Maryland, Michigan, New Jersey,

New York, Oklahoma and Wisconsin. On September 23, 1981, appellants amended their complaint to add two additional party-plaintiffs, the States of Illinois and Pennsylvania. See J.A. 3, 5. On September 24, 1981, the State of California filed a petition to intervene as a plaintiff, which the District Court granted on September 28, 1981. See J.A. 3.

14. Appellants also sought to have 45 C.F.R. § 95.11, the HHS regulation interpreting the 1981 appropriations laws as prohibiting payment of claims for pre-September 30, 1978 expenditures not filed within one year, set aside as contrary to law. See J.A. 12.

main available for payment of the disputed claims. Record, Entry Nos. 2, 7. The requested restraining order and preliminary injunction were designed to prevent the remaining fiscal year 1981 funds from reverting to the general Treasury on October 1, 1981, as would otherwise occur by operation of 31 U.S.C. § 701(a)(2) (1976).[15]

The appellees filed a motion to dismiss for failure to state a claim upon which relief could be granted. On September 28, 1981, the District Court heard oral argument on appellants' motion for temporary relief and appellees' motion to dismiss. At the hearing, the parties agreed to the court's suggestion that it render a final decision on the merits. On September 30, 1981, the District Court issued a memorandum opinion and order dismissing appellants' case for failure to state a claim upon which relief could be granted.

### D. The District Court Decision

In granting appellees' motion to dismiss, the District Court accepted the same basic arguments presented by appellees on appeal. The court noted that both sides agreed (as they do on appeal) that section 306(c) was added to section 306 in response to the time limit provision in H.R. 4389, which was then pending before Congress. It adopted appellees' view that section 306(c) was enacted not to affect time limits contained in future appropriations bills, but "to prevent any confusion as to what the *substantive* law was on claim filing in the unlikely event that H.R. 4389 was passed in the same session as Section 306." J.A. 25 (emphasis in original). In the District Court's view, the legislative history of section 306 showed that the only purpose of section 306(c) was to ensure that, in the event that Congress subsequently enacted H.R. 4389, the time limits in that bill would

not be interpreted as amending the substantive law on the filing of claims contained in section 306. Consequently, it rejected appellants' contention that section 306(c) controlled the continuing appropriations resolutions for fiscal year 1981. The court's decision was based in part on its reluctance to view section 306 as an effort by Congress "to control yearly appropriations in an authorizing statute." As the District Court put it, "to limit the appropriations process in an authorizing statute would play havoc with the appropriations process and would drastically alter the legislative structure." J.A. 25.

On October 7, 1981, appellants filed this appeal. They contend that the District Court erred in concluding that section 306(c) had no bearing on the construction of any appropriations laws. Given the proper interpretation of section 306, they argue, the fiscal year 1981 appropriations resolutions cannot be viewed as restricting the payment of prior-period claims according to the time limit on filing in H.R. 4389.

## II. AVAILABILITY OF FISCAL YEAR 1981 FUNDS FOR PAYMENT OF THE DISPUTED PRIOR-PERIOD CLAIMS

The Government's basic argument, accepted by the District Court below, is that the 1981 appropriations laws incorporated the one-year time limit on claims filing contained in H.R. 4389, and that nothing in section 306 affects the viability or validity of that incorporated provision. This argument revolves around a distinction the Government draws between appropriations laws and authorizing, or other substantive, legislation.

The Government maintains that section 306 established, as a matter of substantive law, permanent time limits on filing state claims for federal matching funds under the

---

15. 31 U.S.C. § 701(a)(2) (1976) provides:

Upon the expiration of the period of availability for obligation, the unobligated balance shall be withdrawn and, if the appropriation was derived in whole or in part from the general fund, shall revert to such fund, but if the appropriation was derived solely from a special or trust fund, shall revert, unless otherwise provided by law, to the fund from which derived: *Provided*, That when it is determined necessary by the head of the agency concerned that a portion of the unobligated balance withdrawn is required to liquidate obligations and effect adjustments, such portion of the unobligated balance may be restored to the appropriate accounts.

Social Security Act. The Government argues that those time limits created, in effect, a statute of limitations that would preclude payment of untimely claims. Nothing in section 306, however, appropriates funds for the payment of any claims, even those that are timely filed. Nor, according to the Government, does section 306 compel Congress to appropriate funds to pay all claims that are timely filed under that section. The Government contends that Congress simply declined to appropriate adequate funds in fiscal year 1981 to pay all of the claims that were timely under section 306, using the one-year time limit in H.R. 4389 as the vehicle for limiting the appropriated funds. Thus, it argues that the one-year time limit in H.R. 4389, as incorporated in the 1981 appropriations laws, is merely a restriction on available funds and is wholly consistent with the provisions of section 306.

Section 306(c), which states that "there shall be no time limit for the filing or payment of . . . claims" other than those in section 306, unless the time limit is specifically exempted from section 306, plainly appears to contradict the Government's position. Relying on the legislative history, however, the Government contends that Congress intended section 306(c) to have a very limited effect. It argues that this provision was only added to section 306 so that, if H.R. 4389 were enacted after section 306 became law, the time limit in H.R. 4389 would not be interpreted as impliedly repealing, as a matter of substantive law, any of the time limits in section 306. Thus, according to the Government, section 306(c)

was never intended to limit Congress' authority to restrict future social security appropriations or to affect the interpretation of future appropriations laws. Consequently, section 306(c) does not, as the Government puts it, "prospectively nullify" the restriction on payment of prior-period claims incorporated into the continuing appropriations resolutions for 1981.

As explained in detail below, we cannot accept the Government's position. We wish to emphasize at the outset, however, that our approach is a fairly narrow one. We need not consider the possible impact of section 306(c) upon any appropriations laws not before us in this case. Clearly, we are not required, nor do we intend, to issue a broad statement on the authority or power of Congress "to control yearly appropriations in an authorizing statute," an issue of apparent concern to the District Court.[16] Nor does this case, as we see it, call into question what the Government refers to as the "well-settled principle that '[a] legislature cannot limit the power of amendment of a subsequent legislature . . . .'" Appellees' Brief at 37 (quoting 1A C. SANDS, SUTHERLAND STATUTES AND STATUTORY CONSTRUCTION § 22.02, at 107 (4th ed. 1972)). Rather, as explained below, our decision rests upon our interpretation of section 306, H.R. 4389 and the fiscal year 1981 appropriations laws, with particular attention focused on the historical relationship between section 306 and H.R. 4389.

A. *The 1981 Continuing Appropriations Resolutions*

"As in all cases involving statutory construction, 'our starting point must be the

---

**16.** Appellants point out, however, that provisions in authorizing legislation have been interpreted to control seemingly conflicting provisions in appropriations laws. In *Pennsylvania v. Weinberger*, 367 F.Supp. 1378 (D.D.C.1973), the court interpreted the Tydings Amendment to the General Education Provision Act. That amendment stated that "[n]otwithstanding any other provision of law, unless enacted in specific limitation of the provisions of this subsection," unobligated funds from certain appropriations laws through fiscal year 1973 would remain available through the next fiscal year. 367 F.Supp. at 1383 (quoting 20 U.S.C. § 1225(b) (1970)). The defendants argued that the Tyd-

ings Amendment could not be read as extending the applicable appropriations through fiscal year 1974 because, *inter alia*, it would conflict with the continuing appropriations resolution for 1973, which provided funding only through 1973. The court rejected this argument because (1) by its terms the Tydings Amendment operated "notwithstanding any other provision of law" not enacted in specific limitation of the Amendment, and (2) the Tydings Amendment was more specific than the continuing appropriations resolution, which provided funds for several different appropriations acts. 367 F.Supp. at 1385.

language employed by Congress' ...."
*American Tobacco Co. v. Patterson,* ——
U.S. ——, 102 S.Ct. 1534, 1537, 71 L.Ed.2d
748 (1982) (quoting *Reiter v. Sonotone
Corp.,* 442 U.S. 330, 337, 99 S.Ct. 2326, 2330,
60 L.Ed.2d 931 (1979)). Since the funda-
mental issue in this case is whether the 1981
appropriations laws preclude payment of
the claims in dispute, we begin our inquiry
by examining the language of the relevant
provisions in those laws. Unfortunately,
those provisions contain little guidance for
decision.

As noted above,[17] the continuing appro-
priations resolutions for fiscal year 1981 for
HHS stated that

> the pertinent project or activity shall be
> continued ... under the authority and
> conditions provided in applicable appro-
> priation Acts for the fiscal year 1980,
> except section 201 of title II of the De-
> partments of Labor, and Health, Educa-
> tion, and Welfare and Related Agencies
> Appropriations Act, 1980 (H.R. 4389) as
> adopted by the House of Representatives
> on August 2, 1979.

Pub.L.No. 96–536, § 101(a)(4), 94 Stat. 3166
(1980); Pub.L.No. 96–369, § 101(a)(4), 94
Stat. 1351, 1351–52 (1980). It is clear that
this provision does not explicitly mention
the one-year time limit on filing claims
contained in H.R. 4389. Nevertheless, if we
disregard the possible effect of section 306,
this provision arguably incorporates the

conditions of H.R. 4389 (except for section
201, *see* note 9 *supra* ), including the one-
year time limit.

The parties offer different explanations
as to whether and how much of H.R. 4389
was incorporated by the 1981 continuing
appropriations resolutions. Appellants con-
tend that the language "under the ... con-
ditions provided in applicable appropriation
Acts for the fiscal year 1980" refers to the
continuing appropriations resolutions for
fiscal ͺear 1980, which, in turn continued
the funding of HHS projects according to
the provisions of H.R. 4389. Thus, they
argue that the 1981 appropriations resolu-
tions only incorporated the conditions of
H.R. 4389 indirectly, through a "double in-
corporation by reference." The Govern-
ment, by contrast, apparently believes that
the words "applicable appropriation Acts
for the fiscal year 1980" refer directly to
H.R. 4389.[18] It argues that the 1981 appro-
priations resolutions show that Congress
clearly intended to incorporate the one-year
time limit in H.R. 4389, particularly in light
of its decision not to incorporate one provi-
sion of H.R. 4389—section 201.[19]

We need not determine whether the 1981
appropriations laws directly or indirectly
incorporated the provisions of H.R. 4389 or
whether Congress explicitly intended to in-
corporate the one-year time limit from that
bill. Despite their apparent disagreement
on these questions, the parties acknowledge

---

**17.** *See* text accompanying note 9 *supra.*

**18.** In its proposed rule and final rule interpret-
ing the 1981 appropriations resolutions, how-
ever, *see* Part I.B. *supra,* HHS accepted the
"double incorporation" theory. *See* 46 Fed.
Reg. 23,273, 23,274 (1981); 46 Fed.Reg. 46,134,
46,135 (1981). The District Court also accept-
ed this theory, concluding that the "1981 ap-
propriations measures, through double incorpo-
ration by reference, prohibit the use of HHS
appropriations to pay claims filed more than a
year after State expenditures." J.A. 23.

**19.** *See* note 9 *supra.* The Government argues
that Congress' deliberate decision to exclude
§ 201 indicates that Congress deliberately in-
cluded every other provision in H.R. 4389, in-
cluding the one-year time limit on filing prior-
period claims. Appellants discount the signifi-
cance of this exception. They note that the
attempt in § 201 to reduce HHS appropriations

by reducing fraud and waste was a failure,
which even its sponsors had abandoned by the
time of the 1981 continuing appropriations res-
olutions. *See* 126 Cong.Rec. H7935 (daily ed.
Aug. 27, 1980) (statement of Rep. Michel).
Thus, appellants contend that Congress' deci-
sion not to continue the effect of § 201 does
not indicate a specific congressional intent to
preserve every other provision of H.R. 4389.
The legislative history of the decision to ex-
clude § 201 from the 1981 appropriations reso-
lutions cited by the Government does not clear-
ly show anything more than an interest in not
prolonging § 201. We therefore conclude that
the exclusion of § 201 does not evidence a
clear intent to preserve the one-year time limit
of H.R. 4389 *and* to override the time limits in
§ 306, nor does it adequately meet the require-
ment of § 306(c).

that the language of the 1981 appropriations resolutions alone is inadequate to support their ultimate positions in this case. Appellants do not contend that the incorporation of the conditions in H.R. 4389 is so ambiguous or indirect that, even without taking into account the effect of section 306(c), the one-year time limit from H.R. 4389 was not effectively incorporated. Rather, their argument hinges on their interpretation of section 306(c). Similarly, the Government does not argue that, even if section 306(c) applies to and governs the interpretation of the appropriations resolutions, the incorporation of the one-year time limit in H.R. 4389 is so explicit that it overrides section 306. Rather, the Government's argument is that section 306(c) simply has no bearing on the appropriations resolutions. In short, the parties appear to agree that *in the absence of section 306* the 1981 appropriations laws would incorporate the one-year time limit in H.R. 4389; the arguments of the parties in this case thus hinge on.their construction of section 306.[20]

B. *Section 306: The Government's Distinction Between Appropriations Laws and Substantive Legislation*

1. *Language of Section 306*

The language of section 306 provides little support for the Government's contention that that law establishes substantive time limits on the filing of claims but has nothing to do with similar time limits in appropriations laws. Of course, section 306 is not an appropriations law and does not itself appropriate funds. Nevertheless, the language of that law does not suggest a rigid distinction between the filing and the payment of state claims; nor does it suggest that time limits imposed in appropriations laws might be entirely different from the time limits in section 306. For example, section 306(b)(2) provides that, for claims filed before the date of enactment of section 306 for reimbursement of pre-October 1, 1979 expenditures, "there shall be *no time limit* for the *payment* of such claims."

*See* note 6 *supra.* Similarly, section 306(b)(3), which appellants claim establishes the time limit for filing the prior-period claims in dispute here, states that for pre-October 1, 1979 expenditures for which no claim has been filed by the date of enactment, "*payment* shall not be made under this Act on account of any such expenditure unless claim therefor is filed ... prior to January 1, 1981." *See* note 7 *supra.*

Appellants rely most heavily on the language of section 306(c) to show that the time limits in section 306 were intended to control over any other *conflicting time limits,* including those contained in appropriations laws. The Government, on the other hand, contends that section 306(c) itself was not intended to apply to appropriations provisions. The language of section 306(c), however, plainly contradicts the Government's assertion:

> Notwithstanding *any other provision of law,* there shall be no time limit for the filing or payment of such claims except as provided in this section, unless such other provision of law, in imposing such a time limitation, specifically exempts such filing or payment from the provisions of this section.

Pub.L.No. 96–272, § 306(c), 94 Stat. 500, 531 (1980) (emphasis added). This language does not support a distinction between appropriations laws and substantive laws; nor does it in any way indicate that section 306(c) was not intended to apply to time limit provisions found in appropriations rather than in so-called substantive legislation.

Furthermore, the claim by the Government that the substantive provisions of section 306 should not be read so as to limit Congress' appropriations authority is a red herring. Nothing in section 306—even under appellants' construction of that section—affects congressional authority to appropriate funds. In this case, for example, Congress could have adopted 1981 appropriations resolutions that provided no funds whatsoever for the programs here at issue.

---

**20.** The parties have pointed us to nothing in the legislative history of the 1981 continuing appropriations resolutions discussing or referring to either the time limit in H.R. 4389 or § 306.

If this had been done, nothing in section 306 could have been read to require payments where no funds were appropriated. However, as it happened, Congress did appropriate funds sufficient to pay appellants' claims in fiscal year 1981; the sole issue in this case is whether the claims were timely filed.

2. *Legislative History of Section 306*

■ Because it can find no support in the statutory language of section 306(c), the Government relies on the legislative history of that section to support its position. The Supreme Court has warned, however, that "[g]oing behind the plain language of a statute in search of a possibly contrary Congressional intent is 'a step to be taken cautiously' even under the best of circumstances." *American Tobacco Co. v. Patterson*, —— U.S. ——, 102 S.Ct. 1534, 1540, 71 L.Ed.2d 748 (1982) (quoting *Piper v. Chris-Craft Industries, Inc.*, 430 U.S. 1, 26, 97 S.Ct. 926, 941, 51 L.Ed.2d 124 (1977)). Indeed, "[a]bsent a clearly expressed legislative intention to the contrary, [the] language [of the statute] must ordinarily be regarded as conclusive." *Consumer Product Safety Commission v. GTE Sylvania, Inc.*, 447 U.S. 102, 108, 100 S.Ct. 2051, 2056, 64 L.Ed.2d 766 (1980). With these standards in mind, we review the legislative history of section 306.

Congress enacted section 306 as part of the Adoption Assistance and Child Welfare Act of 1980. H.R. 4389 was still pending at the time Congress was considering H.R. 3434, the bill that ultimately became that Act. Although the legislative history of section 306 is sparse, it is clear that Congress had the one-year time limit in H.R. 4389 in mind when it enacted section 306. Indeed, both sides in this case agree that the decision to include section 306 in the Act was a direct response to the one-year time limit contained in H.R. 4389.

In a September, 1979 subcommittee hearing on H.R. 3434, Senator Moynihan made it clear that he disapproved of the time limit provision in H.R. 4389 and that he intended to add a provision to H.R. 3434 to overrule it. During that hearing, Barbara Blum, the New York State Commissioner of Social Services, testified about the potential problems the time limit in H.R. 4389 might cause, and Senator Moynihan expressed his intent to counteract that provision.

Senator MOYNIHAN. . . . Are you aware of the provisions of the fiscal 1980 Labor/HEW appropriation conference report currently pending before the Senate which prohibit Federal reimbursement for State and local expenditures for AFDC, title XX, and medicaid programs which are more than a year old? Answer "yes" or "no."

Ms. BLUM. Yes, sir, I am.

Senator MOYNIHAN. And do you think this is a good idea?

Ms. BLUM. No, sir, it is very detrimental.

• . . . .

Senator MOYNIHAN. We are going to try to amend it but let me ask you seriously—we are thinking of putting in, starting around fiscal year 1982, a 2-year limit so you would know that you have 2 years and you better get it done in 2 years. But right now you are just being given no notice at all.

*Hearing on H.R. 3434 Before the Subcomm. on Public Assistance of the Senate Comm. on Finance*, 96th Cong., 1st Sess. 124 (1979) ("*Hearing on H.R. 3434*").

The Finance Committee staff prepared a memorandum explaining Senator Moynihan's suggested solution to this problem. The memorandum makes it clear that his proposed amendment to the Social Security Act was designed to be a permanent alternative to the method of including a time limit in yearly appropriations bills such as H.R. 4389. It states:

Th[e] limitation [in H.R. 4389] would apply only in the case of appropriations in this particular appropriation bill, and it would limit the filing of retroactive claims against these appropriations to between one and two years.

*Senator Moynihan has suggested that another approach be adopted instead* under which the Social Security Act would

be amended effective October 1, 1981 to limit the period of retoractivity [sic] for State claims to a full two years under the various titles of the Act. *Such a provision would be a feature of permanent law (rather than in an annual appropriation bill)*, and would allow States a reasonable time for filing of claims.

*Hearing on H.R. 3434*, at 2 (emphasis added).

At the time the Senate Finance Committee was considering this proposal, the House had already included in its version of H.R. 3434 a limited one-year time limit on filing claims for expenditures under the Child-Welfare Services program, Title IV, Part B of the Social Security Act, 42 U.S.C. §§ 620–628 (1976 & Supp. IV 1980). *See* H.R.Rep.No. 136, 96th Cong., 1st Sess. 78 (1979). The Senate Finance Committee added the more general two-year time limit, applicable to most of the major social security programs, that ultimately became section 306(a) of the Act. *See* S.Rep.No. 336, 96th Cong., 1st Sess. 96, 132 (1979), U.S. Code Cong. & Admin.News 1980, p. 1448. The Committee explained in its Report that it did not intend the time limit to apply retroactively to limit payment for past expenditures. *See id.* at 96.[21]

Despite this interpretation in the Senate Report, several Senators remained concerned about the possible retroactive application of the time limit. When the Senate considered H.R. 3434 on October 25, 1979, they offered a floor amendment designed "to provide a transition period to the provision in the Senate Finance Committee bill." 125 Cong.Rec. S15,128 (daily ed. Oct. 25, 1979) (statement of Sen. Moynihan). The amendment they offered was enacted and now constitutes section 306(b) and section 306(c) of the Act. Senator Moynihan explained:

So this amendment, which Senator Javits and I, Senator Bellmon, and Senator Tsongas and others have introduced, does one simple thing: It says that for claims already filed with HEW—already filed—there is no time limit on HEW's paying them; second, that expenditures made by States up through fiscal 1979 may be claimed as late as January 1, 1981; and, finally, no other limitations shall be valid. 125 Cong.Rec. at S15,128.

The ensuing floor debate on the amendment underscored the fact that section 306 was designed to be a permanent solution to the problem of delayed claims, and to replace the alternative approach of dealing with the problem in appropriations bills. Senator Magnuson, the chairman of the Senate Appropriations Committee, stated that "[w]e in the HEW appropriations have been trying to speed up the claims," and expressed the hope that the amendment would not be an "indication for any more stalling by the States in sending in their claims so that we can dispose of them." 125 Cong.Rec. at S15,128. Although Senator Magnuson regarded the floor amendment as "a reasonable amendment for a transition period," he reiterated that "we are going to insist that we get back to a 2-year limitation," *id.*, perhaps suggesting that he would take action in the appropriations arena. Senator Moynihan responded immediately to his statement:

> Mr. MOYNIHAN. Mr. President, will the Senator permit me to speak? The bill before us establishes the 2-year limitation.
>
> Mr. MAGNUSON. Yes.
>
> Mr. MOYNIHAN. In the law.
>
> Mr. MAGNUSON. OK.

*Id.*

Senator Javits offered a detailed explanation of the floor amendment. His statement indicates that this amendment, like

---

**21.** The Report stated:

> While this provision establishes a time limitation on claiming reimbursement for expenditures for fiscal year 1980 and subsequent years, in the view of the committee it does not authorize any change in the treatment of outstanding expenditures for earlier years.

> The expenditures for such earlier years retain their status as entitlement items for which the Federal Government is obligated by statute to provide appropriate matching.
> S.Rep.No. 336, 96th Cong., 1st Sess. 96 (1979), U.S.Code Cong. & Admin.News 1980, p. 1544.

the provision already added to H.R. 3434 by the Finance Committee, was intended to overrule the time limit in the still-pending H.R. 4389. The Government's argument that section 306(c) was not ...tended to affect limitations in future appropriations laws relies heavily—indeed, almost entirely—on Senator Javits' explanation. We therefore review his comments in detail.

Senator Javits indicated that the two-year time limit in H.R. 3434 was intended to be a permanent alternative to the limiting provision in H.R. 4389. Referring to that provision in H.R. 4389, Senator Javits stated:

> It is my understanding that the Appropriations Committee took this action to force States to file more timely claims so that expenditures under the entitlement programs would be more predictable. While I am in complete agreement with the Appropriations Committee that the process for filing claims should be improved, I am not in agreement with the solution developed by the Appropriations Committee.
>
> H.R. 3434 contains a provision which offers a prospective solution to this problem. . . .

125 CONG.REC. at S15,128. There can be no question, in light of this language, that Senator Javits believed that the amendment to the Social Security Act contained in H.R. 3434 was intended to be an alternative approach that would control over the provision in H.R. 4389.

Senator Javits went on to explain that, since the provision in H.R. 3434 was a "prospective solution," paragraph (b) of the floor amendment (corresponding to section 306(b)), was necessary to deal with the problem of past expenditures. He stated that, under that provision, any claim currently pending before HEW could be paid if otherwise allowable, regardless of how old the claim was. For any expenditure made before October 1, 1979 for which a claim had not yet been filed, the amendment required that a claim be filed by January 1, 1981. 125 CONG.REC. at S15,128.

Finally, Senator Javits explained the purpose of paragraph (c) of the amendment, which ultimately became section 306(c). It is from this statement that the Government derives its distinction between substantive laws and appropriations measures.

> Paragraph (c) of the amendment stipulates that no other provision of law may alter the policy established in H.R. 3434 with respect to the filing or payment of medicaid, welfare or social services claims unless such other provision of law specifically exempts such filing or payment from the provisions of this section. This paragraph is designed to address a concern which might arise if the fiscal year 1980 Labor/HEW appropriations bill [H.R. 4389] is enacted after H.R. 3434 given the general rule that the policy of the most recently enacted bill prevails. I would like to stress that the reason for including this provision is to clarify the intent of Congress should this unusual circumstance occur; consequently, I would recommend to the Finance Committee that this particular paragraph be dropped in the conference on H.R. 3434 if the fiscal year 1980 Labor/HEW appropriations bill is enacted first.

125 CONG.REC. at S15,128. Based on this statement, the Government argues that the sole reason for section 306(c) was to protect against the possibility that H.R. 4389 would be found to have impliedly repealed the *substantive policy* on claims filing embodied in H.R. 3434. It further contends that section 306(c) was not intended to limit Congress' future appropriations authority or to affect the interpretation of any appropriations measure. The final step in the Government's reasoning is that section 306(c) thus has no bearing on the one-year time limit incorporated in the 1981 continuing appropriations resolutions, even though it is the very same limit contained in H.R. 4389.

The Government's argument cannot withstand careful analysis. First, as noted before, it flies in the face of the actual language of section 306(c) enacted by Congress, which by its terms applies to *any law* that establishes any time limit on the filing

or *payment* of claims. Second, it is inconsistent with other congressional statements concerning section 306(c), such as Senator Moynihan's summary of the floor amendment, in which he stated that under the amendment "no other limitations shall be valid." 125 Cong.Rec. at S15,128. Similarly, during the Senate debate on the Conference Report on H.R. 3434,[22] after the amendment had been passed by the Senate and accepted by the House conferees, Senator Moynihan stated that the bill

> regularizes the procedures and timetables under which States file with the Department of Health and Human Services their claims for federal matching under the several titles of the Social Security Act and makes clear that these are entitlement programs, under which all valid claims must be honored by the Federal Government *so long as they are filed within the time periods specified in the Social Security Act itself.*

126 Cong.Rec. S6940 (daily ed. June 13, 1980) (emphasis added).

Finally, the Government's argument badly strains the very language of Senator Javits upon which it is based. Senator Javits drew no distinction between substantive laws and appropriations laws. That he used the word "policy" certainly does not connote so sweeping a distinction, despite the Government's attempt to impute broad significance to that word choice. *See* Appellees' Brief at 47–48. Nor does his suggestion that paragraph (c) be deleted if H.R. 4389 were enacted before H.R. 3434 bolster the Government's position. The Govern-

ment concludes from this suggestion that Senator Javits intended section 306(c) to affect only the time limit in H.R. 4389, rather than possible time limits in future bills as well. But at that time, H.R. 4389 was the one bill containing a conflicting time limit, the time limit at which section 306 was in fact directed. Moreover, as noted above, it seems clear from the legislative history that section 306 was intended to be a permanent alternative to placing time limits in yearly appropriations bills. Accordingly, it is not surprising that Senator Javits did not focus on the possibility that Congress would continue to place time limits in appropriations bills, let alone revive the very limit in H.R. 4389.[23] Lastly, regardless of Senator Javits' suggestion, Congress did enact section 306(c) and it remains in force today.[24] Senator Javits' statements simply cannot bear the weight of the theory the Government places on them. Certainly his words do not constitute a clear congressional intent sufficient to override the plain meaning of the language of section 306(c).

Most importantly, the Government's argument loses sight of what is most apparent from the legislative history of section 306: Congress did not want the time limit in H.R. 4389 to control. Indeed, Senator Javits' statements, which reflect his disagreement with the "solution" in H.R. 4389 and his belief that section 306 would replace it, make this clear. Even his statement about deleting section 306(c) if H.R. 4389 were enacted first supports this view: deleting the provision would have been appropriate, in Senator Javits' opinion, because if

---

**22.** The Conference Report itself merely explains in simple form the provisions of § 306, without even mentioning § 306(c). *See* H.R. Rep.No. 900, 96th Cong., 2d Sess. 66–67 (1980).

**23.** One could also argue that the scenario that formed the basis of Senator Javits' concerns in fact took place: H.R. 4389 was, in a sense, enacted after § 306 when it was incorporated by reference in the 1981 appropriations laws. The Senator intended § 306(c) to make clear that, in such an event, the limits in § 306, rather than those in H.R. 4389, would control.

**24.** The Adoption Assistance and Child Welfare Act of 1980, of which § 306 was a part, was passed in final form by the House and the

Senate on June 13, 1980, 126 Cong.Rec. H4984 (House agreed to Conference Report), S6945 (Senate agreed to Conference Report) (daily ed. June 13, 1980), and signed by the President on June 17, 1980. The conflict over H.R. 4389 had hardened by that time. On September 24, 1979, the Senate considered the conference report on H.R. 4389, but refused to accept the House amendment dealing with federal funding of abortions. 125 Cong.Rec. S13,253–56 (daily ed. Sept. 24, 1979). The Houses were unable to reconcile their differences over that provision, and in October 1979 Congress passed the first continuing appropriations resolution for 1980.

H.R. 4389 were enacted before section 306, it would be clear that section 306 controlled. The Government's argument that is focused on a claim of so-called "prospective nullification" is thus plainly specious. The important point is that, as the legislative history shows, section 306 *was* intended to nullify the time limit in H.R. 4389 itself, which is the very time limit that the Government maintains is preserved in the 1981 appropriations laws.

C. *The Nature of the Time Limit in H.R. 4389 as Allegedly Incorporated in the 1981 Appropriations Laws*

The Government's argument in this case really depends on two propositions: The first proposition is that section 306 does not apply to or affect the interpretation of provisions in appropriations resolutions. We have already rejected this as inconsistent with the language and legislative history of section 306. The second, correlative proposition is that, as allegedly incorporated in the 1981 appropriations laws, the one-year time limit in H.R. 4389 is merely an appropriations provision that restricts available funds but does not conflict with the time limits in section 306. We now turn briefly to this contention.

We reject the suggestion that there is a clear demarcation between so-called substantive provisions and appropriations provisions where, as in the context of this case, both establish time limits on the filing and payment of state claims for federal matching funds. Assuming, however, that the distinction is as clear as the Government seems to contend, we are not convinced that the restriction in the 1981 appropriations laws falls on the "appropriations" side of the line.

Historically, Congress has dealt with the substantive policy problem of prolonged delay in the filing of reimbursement claims by inserting restrictive provisions in appropria-

tions bills. For example, in a fiscal year 1979 appropriations bill, H.R. 12929, 95th Cong., 2d Sess. (1978), the Senate Appropriations Committee included a provision imposing a ninety-day time limit on the filing of claims for pre-1977 Medicaid expenditures. *See* S.Rep.No. 1119, 95th Cong., 2d Sess. 83 (1978). While the conference committee deleted the provision, the explanation it offered indicates that it was concerned not merely with reducing HHS appropriations, but with forcing the states to file more timely claims.

> Although the conferees have decided against a fixed time limitation for submitting welfare claims at this time, the Appropriations Committees are concerned about the difficulty of estimating current funding requirements for medicaid, assistance payments and social services programs if States can be reimbursed out of current appropriations for claims that occurred in previous years. While not wishing to penalize States that have legitimate reasons for submittal of late claims, the conferees believe that the Federal, State, and local agencies in the public assistance programs must keep their accounting records up to date and eliminate such retroactive funding practices.

H.R.Rep.No. 1746, 95th Cong., 2d Sess. 17 (1978) (Conference Report).

Congress viewed the time limit in H.R. 4389 as addressing the same concerns. During the debate on the section 306 amendments, Senator Javits stated in reference to the restrictive provision in H.R. 4389: "It is my understanding that the Appropriations Committee took this action to force States to file more timely claims so that expenditures under the entitlement programs would be more predictable." 125 Cong.Rec. S15,128 (daily ed. Oct. 25, 1979).[25] Indeed, the Government's argument concerning the purpose of section 306(c) is

---

25. The report of the hearings on H.R. 3434, held by the Subcommittee on Public Assistance of the Senate Finance Committee, contain a memorandum entitled "Information Sheet on H.R. 4389." This memorandum, apparently submitted to the committee by Commissioner

Blum of New York to persuade the Senators to overrule the time limit in H.R. 4389, *see* Part II.B.2. *supra*, also indicates that that time limit originated as an effort to alleviate the problem of delayed claims filing. *See Hearing on H.R. 3434*, at 126.

based on the premise that Congress passed that section because it feared the limiting provision in H.R. 4389 would implicitly repeal, as a matter of *substantive law*, the time limit *policy* in section 306.

Nevertheless, the Government contends that the very same provision of H.R. 4389, which it believes Congress explicitly and purposely incorporated in the 1981 appropriations laws, was somehow transformed into a "mere" appropriations restriction in that context. In discussing the history of section 306(c), the Government states that the limiting provision in H.R. 4389, coupled with the explanation in the conference report,[26] "could have been interpreted as an indication that the restriction in H.R. 4389 was intended to establish substantive *policy* for the filing and payment of claims under the Social Secuirty [sic] Act, and not merely to restrict the use of fiscal year 1980 funds." Appellees' Brief at 41 (emphasis in original). In discussing the same provision of H.R. 4389 as allegedly incorporated in the 1981 appropriations laws, however, the Government concludes that it "is a classic appropriations restriction," rather than substantive legislation. *Id.* at 51.[27]

The basis for this transformation is not apparent. It surely cannot be that the lim-

iting provision in H.R. 4389 meánt one thing when it was spelled out in that bill and another when it was allegedly incorporated by reference in the 1981 appropriations resolutions. No explanation is offered for these glaring inconsistencies in the Government's arguments, in all likelihood because none is available. The suggested distinctions between *substantive* and *appropriations* provisions simply make no sense in the context of this case. If Congress had intended in fiscal year 1981 to deny or limit funds available for prior-period claims—to some amount *below* what had been available during the preceding year—it had at least two clear options: (1) limit the amount of the appropriation to HHS for fiscal year 1981 for the programs in question or (2) adopt time limits that were more rigid than those contained in section 306, employing the express exemption required by section 306(c). The latter method, *i.e.*, implementation of more rigid time limits on prior-period claims, is an indirect means of controlling HHS expenditures. Had it been employed in 1981, as it was in the continuing appropriations resolutions for fiscal year 1982,[28] there would be no question about the validity of the limit.

**26.** The conference report explained that the provision in H.R. 4389 barring payment of claims for pre-September 30, 1978 expenditures was actually intended to impose a one-year time limit on the filing of those claims. H.R. Rep.No. 400, 96th Cong., 1st Sess. 18 (1979). *See* Part I.A. *supra.*

**27.** Remarkably, the Government also insists that the 1981 appropriations laws do not impose a time limit derived from H.R. 4389 at all. In summarizing the purpose of § 306(c), the Government states that "[b]y stipulating in section 306(c) that the time limitation policy in section 306 of H.R. 3434 would govern unless 'specifically' superseded by some other law, Senator Moynihan and his colleagues provided protection to section 306 against an implied repeal by subsequent enactment of H.R. 4389 ...." Appellees' Brief at 42. Based on that premise, the Government then makes the following circular leap: "Since the restriction in House-passed H.R. 4389, incorporated in the fiscal year 1981 appropriations laws for HHS, does not 'specifically' supersede section 306, the Government has *not* sought 'to apply a time limit for past-period claims derived from H.R. 4389' (Brief for the Nine Appellant States, p.

22)." *Id.* Clearly this conclusion is at odds with the Government's contention that the 1981 appropriations laws explicitly incorporated the one-year time limit in H.R. 4389. It is also inconsistent with the Government's position that § 306(c) cannot be used to construe the meaning of those appropriations laws. Congress' failure to exempt the one-year time limit from the provisions of § 306 cannot reasonably be interpreted to support the conclusion the Government draws from it.

**28.** The fiscal year 1982 appropriations act for HHS, H.R. 4560, 97th Cong., 1st Sess. (1981), contained a provision stating:

Notwithstanding section 306 of Public Law 96–272 or section 1132 of the Social Security Act, no payment shall be made from this or any other appropriation to reimburse State or local expenditures made prior to October 1, 1978, under title I, IV, X, XIV, XVI, XIX, or XX of the Social Security Act unless a request for reimbursement had been officially transmitted to the Federal Government by the State within one year after the fiscal year in which the expenditure occurred.

*Id.* § 207. The bill passed the House, 127 Cong. Rec. H7097 (daily ed. Oct. 6, 1981), and was

In short, we hold that even if the 1981 continuing appropriations resolutions can be read to incorporate the time limits from H.R. 4389, the incorporation was ineffective because it did not comply with section 306(c). The requirements of section 306(c) could not be ignored simply because—as the Government contends—the new time limits for 1981 were a part of appropriations resolutions as opposed to substantive law. The suggested distinction is one without meaning in the context of this case.

### D. Concluding Remarks

As we noted at the beginning of our analysis, our decision is a narrow one. We are concerned only with the fiscal year 1981 appropriations laws. Those laws incorporated, without comment or explanation, virtually all of the provisions of H.R. 4389, including the one-year time limit on the filing of certain prior-period claims. In enacting section 306, however, Congress expressed its disagreement with that time limit and its belief that the permanent solution to the problem of delayed claims embodied in section 306 should control over H.R. 4389. The words of section 306(c) plainly state that no other limits on the filing or payment of claims shall control unless they are specifically exempted from section 306. And, whatever ambiguity there may be in the legislative history about the reach of section 306(c), there is no question that it was intended to ensure that the time limits in section 306 would control over the conflicting provision in H.R. 4389.

We would have to disregard the language of, and the intent behind, section 306 to reach the result urged by the Government and accepted by the District Court. The Government has provided us no sound reasons for doing so.

■ We have considered the Government's argument that, despite the plain words of section 306(c), that provision was intended to apply to the time limit in H.R. 4389 as a provision of substantive law in 1980, but not as an appropriations provision in 1981. To follow the Government's approach would lead us down a path fraught with hazards. The Supreme Court has only recently warned that "[s]tatutes should be interpreted to avoid untenable distinctions . . . whenever possible." *American Tobacco Co. v. Patterson*, —— U.S. ——, 102 S.Ct. 1534, 1538, 71 L.Ed.2d 748 (1982); *see id.* at 1539 n.6. That is what we do today. We need not determine how section 306(c) would affect our decision if a different appropriations provision were before us. Nor do we need to decide, as a general matter, the extent to which Congress can control or limit appropriations authority in an authorizing statute. Resolution of those questions must await another day.

### III. AVAILABILITY OF INJUNCTIVE RELIEF

■ When this suit was filed, appellants sought preliminary injunctive relief to prevent the remaining fiscal year 1981 funds appropriated to HHS from reverting to the general Treasury under 31 U.S.C. § 701(a)(2) (1976). *See* note 15 *supra*.[29]

reported to the full Senate on November 9, 1981. 127 CONG.REC. S13,145 (daily ed. Nov. 9, 1981). As such, the provisions of the bill were incorporated into the second continuing appropriations resolution for fiscal year 1982. Act of Dec. 15, 1981, Pub.L.No.97–92, § 101(a)(1)–(3), 95 Stat. 1183 (1981).

Congress' incorporation of this provision in fiscal year 1982 could bear on the interpretation of the 1981 appropriations laws in several ways. On the one hand, it could be viewed as an indication that Congress did intend to incorporate the one-year time limit in the 1981 laws and simply neglected to do so explicitly. On the other hand, it could be viewed as a congressional acknowledgement that, to effectively incorporate such a time limit, it is necessary to

exempt it from § 306, something it failed to do in the 1981 laws. In any event, neither side in this case relies on the 1982 appropriations provision to support its construction of the 1981 laws.

**29.** Appellants do not question whether the balance of the 1981 HHS appropriations reverted by operation of 31 U.S.C. § 701(a)(2). We note, however, that under 31 U.S.C. § 665b (1976), "[a]ny provision of law which requires unexpended funds to return to the general fund of the Treasury at the end of the fiscal year shall not be held to affect the status of any lawsuit or right of action involving the right to those funds." *But see* 119 CONG.REC. 22,326 (1973) (statement of Sen. Chiles) (indicating

The District Court refused to grant the requested preliminary relief, dismissing the suit instead. In light of the reversion of the remaining 1981 HHS appropriations, the Government now argues that appellants are no longer eligible for injunctive relief, even if we decide that the 1981 appropriations laws did not preclude payment of the disputed claims and that HHS therefore unlawfully refused to process those claims. We do not agree.

■ This court has repeatedly "reaffirmed the power of the courts to order that funds be held available beyond their statutory lapse date if equity so requires." *National Association of Regional Councils v. Costle*, 564 F.2d 583, 588 (D.C.Cir.1977); accord, *Jacksonville Port Authority v. Adams*, 556 F.2d 52, 55–57 (D.C.Cir.1977); *City of Los Angeles v. Adams*, 556 F.2d 40, 51 (D.C.Cir.1977); *National Association of Neighborhood Health Centers, Inc. v. Mathews*, 551 F.2d 321, 338–39 (D.C.Cir.1976). We have made it clear that the power to prevent the statutory lapse or reversion of an agency's budget authority[30] does not conflict with Congress' exclusive power to appropriate funds.

> Decisions that a court may act to prevent the expiration of budget authority which has not terminated at the time suit is filed are completely consistent with the accepted principle that the equity powers of the courts allow them to take action to preserve the status quo of a dispute and to protect their ability to decide a case properly before them. In such situations, the courts simply suspend the operation of a lapse provision and extend the term of already existing budget authority.

*National Association of Regional Councils*, 564 F.2d at 588; accord, *Jacksonville*, 556 F.2d at 55; *Grueschow v. Harris*, 492 F.Supp. 419, 422 (D.S.D.), aff'd, 633 F.2d 1264 (8th Cir. 1980). Under the controlling case law, the critical question is whether the budget authority has already lapsed before suit has been filed. As the court in *National Association of Regional Councils* stated, "If . . . budget authority has lapsed before suit is brought, there is no underlying congressional authorization for the court to preserve." *Id.* at 588–89;[31] accord, *Township of River Vale v. Harris*, 444 F.Supp. 90, 93–94 (D.D.C.1978). Since appellants filed this suit and requested preliminary relief before the remaining 1981 funds lapsed, the District Court clearly had equitable authority to suspend operation of the statutory lapse provision.

■ As we concluded in Part II *supra*, the District Court's decision to dismiss appellants' suit and not to grant them the requested relief was based on an erroneous interpretation of the relevant statutes. Ordinarily, it is within the broad remedial authority of an appellate court to reverse an erroneous decision of a lower court and to order that appropriate relief be awarded. See 28 U.S.C. § 2106 (1976).[32] In *Jacksonville Port Authority v. Adams*, 556 F.2d 52 (D.C.Cir.1977), this court recognized its continuing authority to order injunctive relief in circumstances similar to those in this case. In *Jacksonville*, the plaintiff port authority sued to secure funds allocated to it by statute. The plaintiff requested a temporary restraining order shortly before the

---

that this provision was intended to be limited in scope).

**30.** The term "budget authority" is a general term describing an agency's authority, granted by Congress, to enter financial obligations. It encompasses appropriations, contract authority and borrowing authority. *See National Ass'n of Regional Councils*, 564 F.2d at 586.

**31.** Distinguishing other cases in which suit had been filed before the relevant budget authority lapsed, the court in *National Association of Regional Councils* concluded that it had no authority to order obligation of budget authori-

ty that had lapsed before suit was filed. 564 F.2d at 588–90.

**32.** 28 U.S.C. § 2106 (1976) provides:

> The Supreme Court or any other court of appellate jurisdiction may affirm, modify, vacate, set aside or reverse any judgment, decree, or order of a court lawfully brought before it for review, and may remand the cause and direct the entry of such appropriate judgment, decree, or order, or require such further proceedings to be had as may be just under the circumstances.

cutoff date of the authority of the agency involved to obligate the funds sought by plaintiff. The District Court denied the requested preliminary relief, and the cutoff date passed.[33] Nevertheless, the court of appeals held that the case was not moot, and that it had the authority under 28 U.S.C. § 2106 to "provi[de] the relief even at this late date that would have been available on the merits from the [District] [C]ourt if it had done what should have been done and provided a preservation remedy." 556 F.2d at 57.

Despite this holding, the Government relies on the reasoning of the court in *Jacksonville* to support its argument that injunctive relief is no longer available to appellants in this case. The argument is based upon two comments made by the court in *Jacksonville* in discussing whether injunctive relief was still available. First, the court stated: "In appraising the equity and justice of ordering a grant under lapsed authority, it is material to consider whether Congress has turned its back on the program as contrary to sound policy." 556 F.2d at 56. Second, the court "noted that Jacksonville did not sleep on its rights in making application or bringing suit." *Id.* at 57. The Government construes these remarks as a rigid, "two-part test" for determining whether relief is still available, *see* Appellees' Brief at 62, even though it appears from the opinion in *Jacksonville* that these were simply factors that the court considered in determining whether to exercise its equitable authority. In any event, we do not believe either of those factors bars injunctive relief in this case.

■ The Government argues that appellants were not diligent "either in bringing suit or in preserving their rights on appeal." Appellees' Brief at 64. We disagree. Appellants could not have been expected to

file suit earlier than they did because HHS had not yet issued a final rule barring payment of the disputed claims. As it was, appellants filed suit two days before the final rule was published. Had they done so earlier, their suit would probably have been dismissed as premature, on the ground that HHS could still provide complete relief in a final rule. The Government also argues that appellants' failure to seek a stay pending appeal precludes injunctive relief at this point. The District Court, however, issued its decision on September 30, 1981, the last day of the fiscal year, when the funds were to revert to the general Treasury. Appellants would have had to file an emergency motion for an injunction, which this court would have had to consider and grant, within hours of the District Court decision. Their failure to do so hardly constitutes "sleeping on their rights." The court in *Jacksonville* in fact concluded that the failure of the appellant in that case to immediately appeal the denial of the requested temporary restraining order did not constitute a lack of diligence.[34] In reaching this conclusion, it stated: "[W]e do not think it sound to impose a burden of frantic exhaustion of appellate remedy at the last moment." 556 F.2d at 57 (footnote omitted). Imposing such a burden would be equally unwise in the circumstances of this case.[35]

Finally, the Government argues that, by incorporating the one-year time limit in the continuing appropriations resolution for fiscal year 1982, *see* note 28 *supra*, Congress "has turned its back on the program as contrary to sound policy." *Jacksonville*, 556 F.2d at 56. As appellants point out, however, Congress clearly has not turned its back on providing State grants for the social security programs in question as contrary to sound policy. In addition, appellants do not seek payment of their claims from fiscal year 1982 funds, and neither

---

**33.** The District Court dismissed the complaint for injunctive relief as moot after the cutoff date had passed. *See* 556 F.2d at 54–55.

**34.** The court did not decide whether Jacksonville could have appealed the denial of the temporary restraining order under 28 U.S.C. § 1292(a)(1) (1976). 556 F.2d at 57.

**35.** Indeed, imposing such a burden would be more inappropriate and inequitable in this case because HHS, in effect, controlled the timing of the suit by controlling the time of its final rulemaking.

side has argued that Congress' action in the 1982 appropriations laws has any bearing on whether Congress precluded payment of those claims from the fiscal year 1981 appropriations. We have already decided that Congress did *not* preclude payment of the claims from 1981 funds. To decide that Congress' express inclusion of the one-year time limit in the 1982 appropriations laws should preclude injunctive relief concerning 1981 appropriations would, in practical effect, change our decision on the merits.[36]

Moreover, concluding that appellants are no longer eligible for injunctive relief would lead to a highly unjust result. It would mean that, because of the timing of HHS's rulemaking, an unlawful decision by HHS not to process appellants' claims, an erroneous District Court decision, and the passage of less than one day's time, appellants are no longer entitled to meaningful relief. "Our authority under 28 U.S.C. § 2106 to fashion an appellate remedy in the interest of justice," *Jacksonville*, 556 F.2d at 57, permits us to avoid such an outcome. We therefore reject the Government's argument that appellants are no longer eligible for injunctive relief.

Having decided that the appellants are entitled to injunctive relief, we point out that the scope of that relief is limited to the amount of fiscal year 1981 funds which remain available. Indeed, at oral argument, counsel for the nine states conceded that it is undisputed that the claims in issue may only be satisfied out of whatever balance remains. While our decision is to be taken as establishing a presumption that these funds are available, this question is not fully resolved. During oral argument, counsel for the Government suggested that funds could not be reached, but was unwilling to state unequivocally that any relief the court might grant would be futile. Accordingly, we remand to the District Court for the purpose of determining whether funds are available to satisfy the claims and, if so, the extent of that balance.

**36.** We also reject the Government's argument that the words "any other appropriation" that were incorporated into Pub.L.No.97–92, *see* note 28 *supra*, have the effect of barring pay-

## IV. CONCLUSION

For the reasons set forth above in Part II, we conclude that the appropriations laws for fiscal year 1981 did not bar payment of the prior-period claims in dispute. We further conclude that appellants are entitled to injunctive relief, as discussed in Part III. We therefore reverse the District Court's decision and remand so that the District Court may fashion appropriate relief.

*So ordered.*

ment of the disputed claims from 1981 as well as 1982 appropriations. *See* Appellees' Brief at 66.